James **ESTAKHRIAN**, et al.

v.

Mark **OBENSTINE**, et al.

Case No. CV 11–3480 FMO (CWx)

United States District Court,
C.D. California.

Signed 02/04/2017

---

Dan L. Gildor, Mark A. Chavez, Nance F. Becker, Chavez and Gertler LLP, Mill Valley, CA, Raymond C. Fay, Fay Law Group PLLC, Steven M. Skalet, Merhi and Skalet PLLC, Washington, DC, S. Ron Alikani, Irvine Law Group LLP, Irvine, CA, for James Estakhrian, et al.

Harry A. Safarian, Alexis Ara Baroian, Safarian and Baroian LLP, Glendale, CA, Kenneth Charles Feldman, Larissa G. Nefulda, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, for Mark Obenstine, et al.

**Proceedings: (In Chambers) Order Re: Motion for Class Certification**

The Honorable Fernando M. Olguin,
United States District Judge

Having reviewed and considered all the briefing filed with respect to plaintiffs' Motion for Class Certification (Dkt. 424, "Motion"), the court concludes that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78; Local Rule 7–15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## INTRODUCTION

The instant matter arises out of a class action that was litigated in Nevada state court, Daniel Watt, et al. v. Nevada Property 1, LLC, et al., Case No. A582541 ("Nevada litigation"). (See Dkt. 490, Court's Order of October 24, 2016, at 2) (citing Dkt. 373, Second Amended Class Action Complaint ("SAC") at ¶ 20). On February 11, 2009, plaintiffs filed a class action complaint regarding the purchase of condominium units in what became the Cosmopolitan Hotel ("Cosmopolitan"), located in Las Vegas, Nevada. (See id.) (citing Dkt. 373, SAC at ¶ 20). The class members sought to "rescind their purchase contracts and to obtain a refund of their escrow deposits[.]" (See id.) (citing Dkt. 373, SAC at ¶¶ 14–16). The Nevada litigation was eventually settled in two stages in 2010. (See Dkt. 373, SAC at ¶ 32; see also infra at Statement of Facts (describing East Tower and West Tower settlements)).

Thereafter, on April 22, 2011, plaintiff James Estakhrian ("Estakhrian"), on behalf of himself and others similarly situated, filed this action against defendants Mark Obenstine ("Obenstine"), Benjamin F. Easterlin ("Easterlin") and his law firm King & Spalding, LLP ("King & Spalding," and with Easterlin, the "King & Spalding defendants"), Terry A. Coffing ("Coffing") and his law firm Marquis & Aurbach P.C. (now called Marquis Aurbach Coffing, P.C.) ("MAC" and with Coffing, the "MAC defendants"). (See Dkt. 1, Complaint). Obenstine, the King & Spalding defendants, and the MAC defendants are all attorneys who represented the class members in the Nevada litigation. (See id. at ¶¶ 17–20). The court previously dismissed the MAC defendants for lack of personal jurisdiction. (See Dkt. 329, Court's Order of July 9, 2015). The court also approved a class settlement between plaintiffs and the King & Spalding defendants and entered judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. (See Dkt. 490, Court's Order of October 24, 2016, at 21–22). As

such, Obenstine is the sole remaining defendant in this action.

On October 27, 2015, the operative SAC was filed to add Abdi Naziri ("Naziri") as an additional named plaintiff (collectively, Estakhrian and Naziri are referred to as "plaintiffs"). (See Dkt. 373, SAC). Plaintiffs assert common law torts for professional malpractice, breach of fiduciary duty, and fraud against Obenstine. (See id. at ¶¶ 51–60 & 76–77). Plaintiffs also assert statutory claims for violations of California Business & Professions Code §§ 17200, et seq. ("UCL" or "unfair competition") and California Consumers Legal Remedies Act, California Civil Code §§ 1750, et seq. ("CLRA"). (See id. at ¶¶ 67–75). Finally, Estakhrian asserts a claim for breach of contract on behalf of a subclass of approximately 500 purchasers who entered into a retainer agreement with Obenstine. (See id. at ¶¶ 19, 61–66 & Exhibit ("Exh.") A).

Plaintiffs seek to certify two classes. (See Dkt. 424–1, Joint Brief Concerning Plaintiffs' Motion for Class Certification ("Class Cert. Jt. Br.") at 1). As to the first, second, fourth, and fifth causes of action for professional malpractice, breach of fiduciary duty, unfair competition, and the CLRA,[1] plaintiffs seek to certify the following class: "All individuals who were class members in, i.e. did not opt out of, Daniel Watt, et al. v. Nevada Property 1, LLC, et al., Nevada District Court, Case No. A582541, excluding Sanjay Varma." (Dkt. 424–1, Class Cert. Jt. Br. at 1). As to the third cause of action for breach of contract, Estakhrian also seeks certification of a subclass consisting of: "[All] class members who entered into a retainer agreement with Defendant Mark Obenstine regarding the subject matter of the [Nevada litigation]." (Id.).

## STATEMENT OF FACTS

### I. BACKGROUND OF THE NEVADA LITIGATION.

The Cosmopolitan was promoted as a project consisting of a West Tower with more than 1,300 condominium units and an East Tower with more than 700 units. (See Dkt. 373, SAC at ¶ 14). Purchasers of the units signed purchase and sale agreements, and made earnest money deposits totaling approximately $250 million, or $140,000 per purchaser, on average. (See id.).

The developer of the Cosmopolitan, 3700 Associates LLC, projected that the condominium units would be ready for occupancy in early 2008. (See Dkt. 373, SAC at ¶ 15). However, 3700 Associates LLC defaulted on its construction loan with Deutsche Bank, which then foreclosed on the property in March 2008. (See id.). Following the foreclosure, Nevada Property 1, LLC ("NP1"), a wholly-owned subsidiary of Deutsche Bank, acquired the property and all rights and obligations under the purchase and sale agreements. (See id.).

### A. The King & Spalding Defendants.

On August 22, 2008, a purchaser of a Cosmopolitan unit, Carol Muszik ("Muszik"), contacted Easterlin about NP1's refusal to return her earnest money deposit after 3700 Associates LLC filed for chapter 11 bankruptcy. (See Dkt. 433–5, Joint Evidentiary Appendix Concerning Defendant Mark Obenstine's Motion for Summary Judgment / Adjudication ("MSJ. Evid. App'x"), Exh. 19 at P0149; Dkt. 433–10, MSJ Evid. App'x, Exh. 33 at P0516). On August 29, 2008, Easterlin contacted Obenstine by email about the possibility of jointly litigating the issues raised by Muszik, and referred Obenstine to a blog of Cosmopolitan purchasers. (See Dkt. 433–10, MSJ Evid. App'x, Exh. 19 at P0516; Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0151). A few days later, Easterlin told Obenstine that he had uploaded a fake post to the blog, stating that Cosmopolitan purchasers were in contact with them, the "Trump Tower attorneys."[2] (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0151) ("When you look at the

---

[1]. Plaintiffs do not seek to certify any class as to their sixth cause of action for fraud. (See Dkt. 424–1, Class Cert. Jt. Br. at 1) (omitting fraud cause of action from definition of the class and subclass that plaintiffs seek to certify).

[2]. Obenstine and Easterlin previously represented condominium purchasers in a class action regarding condominium units in the Trump Tower in Las Vegas, Nevada. (See Dkt. 373, SAC at ¶ 17).

blogs, you will see one where someone tells everyone they are in contact with Trump Tower attorneys. I wrote that blog to generate interest and to keep people from pursuing other avenues until we spring into action.").

On October 2, 2008, Easterlin told Obenstine that he and his firm had a conflict of interest:

> I have received bad news. Deutsche Bank is a K & S client. Because Nevada Property 1, LLC is an affiliate of the bank, K & S has a clear conflict of interest that would enable the defendant to disqualify the firm from any litigation involving NP1. Moreover, the firm does not want to damage its relationship with this client. So, I am directed that K & S cannot be part of any engagement letter with any clients and cannot be on any pleadings in any litigation against NP1. If this means that you want to proceed without me, I understand. Of course, I would like to continue if you are agreeable and my involvement would be helpful. In that event, I think we would be talking about filing a class action with [Obenstine] and local counsel on the pleadings, and [Obenstine] hiring K & S to do work for him. He and I have discussed that possibility. The immediate problem I see, though, is signing up people. We have enough to proceed with a class action, but we want more to provide more leverage in discussions with local counsel.

(See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0153).

Despite Easterlin and his firm's conflict of interest, Easterlin continued to participate in the Nevada litigation with Obenstine. For example, on October 4, 2008, two days after Easterlin advised Obenstine of his conflict of interest, Obenstine and Easterlin exchanged drafts of an engagement letter to retain Cosmopolitan condominium purchasers, (see Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0154; see id. at P0105 & P0121), and began retaining clients two days later. (See, e.g., id. at P0104, P0105, P0155 & P0157). Easterlin and Obenstine also sent periodic updates to their clients regarding the status of the Nevada litigation. (See Dkt. 433–11, MSJ Evid. App'x, Exh. 38 at P0569 & P0579; id. at

P0571 (forwarding February 2009, complaint to clients); id. at P0570 (forwarding amended complaint to clients)). Easterlin reviewed the terms of the East Tower settlement, (see Dkt. 433–8, MSJ Evid. App'x, Exh. 28 at P0415–18), and had one-on-one communications with at least one potential client in the Nevada litigation. (Dkt. 433–10, MSJ Evid. App'x, Exh. 33 at P0518–19) (January 31, 2009, email from Easterlin to potential client). Indeed, Easterlin was described to potential clients as the Nevada litigation's "lead attorney," with the "clout" and "deep pockets" to litigate the case. (See, e.g., Dkt. 433–5, MSJ Evid. App'x at P0111 ("Ben Easterlin with King and Spalding is our lead attorney . . . in partnership with Mark Obenstine out of California."); see id. at P0113 (January 26, 2009, email providing Easterlin's contact information to a new client); id. at P0118 (email to new client, "if you haven't looked up the bio on our lead attorney you should. His name is Ben Easterlin and he represents Coca Cola and Sprint"); id. at P0148 ("As you know [Ben Easterlin] is the force behind all of our claims and he has the most clout as well as the deep pockets to fight for us and carry us through.")).

B. Donna Billiter a/k/a "Kay Jackson."

Around the time Easterlin approached Obenstine about jointly litigating the Nevada litigation, Easterlin sought to hire Donna Billiter ("Billiter" or "Jackson"). In an email to Obenstine, Easterlin stated the following:

> Mark, if you have time, I recommend looking at this. I just looked at it, and there is a group of people who want their money back at Cosmopolitan. I think we should try to get up another group and go after it. We will have to decide on a couple of things: . . . (2) we need an organizer. I don't know that we could find another Donna. I would like to use Donna, but I am worried that since she is not a purchaser there and would be doing that for a fee she would really be subject to a suit or we might be accused of unethical conduct for having a "runner." It might be that Donna could get Carol Musik [sic] or someone who is a purchaser to be the front person,

with Donna directing her and keeping the records.

(Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0151).

On September 14, 2008, Billiter registered the domain name, cosmopolitanownerslv.com. (See Dkt. 433–4, MSJ Evid. App'x, Exh. 16 (December 3, 2012, deposition of Donna Billiter) at P0004). In October 2008, Billiter, Easterlin, and Obenstine began retaining clients. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0155 (October 17, 2008, email scheduling teleconference among Easterlin, Obenstine, and Billiter because "[Billiter] is interested in providing an update regarding Cosmopolitan"); id. at P0126 (April 8, 2009, email, in which Obenstine requested that Billiter "please call [a potential client]. He is still unsigned. You are better at closing the deal with the exceedingly hesitant prospective clients.")).

During the process of retaining clients, Billiter used the name "Kay Jackson." (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0105) (email from Billiter to Obenstine using the name, "Kay Jackson," for the first time, and stating "[d]on't forget who I am."); see, e.g., id. at P0106, P0110, P0113, P0118, P0122 & P0125; Dkt. 433–11, MSJ Evid. App'x, Exh. 38 at P0574 (January 5, 2009, email from client to Easterlin, Obenstine, and "Kay Jackson"); id. at P0572 (January 11, 2009, email from Obenstine to Easterlin, "Kay Jackson," and client). In her email communications and on the cosmopolitanownerslv.com blog, Billiter, posing as "Kay Jackson," told prospective clients that she (Kay Jackson) purchased a unit in the complex—which was actually owned by Muszik—and retained attorneys to represent the Cosmopolitan purchasers. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0163 & P0128; Dkt. 426–4, Joint Appendix in Support of Joint Brief re Plaintiffs' Motion for Class Certification ("Class Cert. Evid. App'x"), Exh. 23 at JA0409) ("I was not going to take a chance with my $120,000 [escrow deposit]"); Dkt. 426–4, Class Cert. Evid. App'x, Exh. 23 at JA0409 ("[O]ur numbers are growing, slowly, but they are still growing. I am signing people all by myself and I have to make sure I am talking to a real person by verifying their unit number before I can send them the cover letter and engagement letter."); id. ("I think some people are taking their sweet time [joining the group] because they have just hopped on board and [are] just looking around and do not realize all of the work and research that I have done before picking the law firm that is representing us.").

Because Billiter was representing to putative class members that she was the purchaser of the unit actually owned by Muszik, it was necessary for Billiter to hide her "Kay Jackson" alias from Muszik. For example, in an October 27, 2009, email to Easterlin, which Obenstine was copied on, Billiter explained:

> Ben, please make sure you tell Carol [Muszik] to ONLY consult with you regarding the settlement. On all of the spread sheets[,] I am using her unit number and my name, Katherine Jackson. As long as she doesn't call anyone other than the attorneys I am fine. . . . If she responds to Sonny or another third party with the unit number 4028 and it is Carol Musik [sic] on my contract then my cover is blown. I have altered all of the spread sheets along with the email addresses. . . . Also Carol doesn't know my alter ego, Kay. She only knows me as Donna and isn't really crazy about me.

(Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0163). Muszik complained to Easterlin that "Donna has been pressuring [her] to sign an engagement letter for the pursuit of Cosmopolitan." (Dkt. 433–10, MSJ Evid. App'x, Exh. 33 at P0519).

### C. The Retainer Agreement with Mark Obenstine.

Approximately 500 Cosmopolitan purchasers, including Estakhrian, entered into a retainer agreement with Obenstine. (See Dkt. 373, SAC at ¶ 19 & Exh. A). In relevant part, the agreement states as follows: "[W]e prefer to proceed with an arbitration claim because it is likely to prove more expeditious and less expensive than a lawsuit. However, we will continue to consider and evaluate all legal alternatives, appreciative that the discovery of new information or changed cir-

cumstances may make the filing of a lawsuit in state or federal court the more beneficial course of action." (Id., Exh. A at ¶ 1).

The approximately 500 retained clients agreed to pay $1,000 for costs and to "assign to [Obenstine] a contingency fee" ranging from 12.6% to 28.0% of any recovery. (Dkt. 373, SAC, Exh. A at ¶¶ 3 & 5) ("The Firm has decided to make a good faith concession for the economic benefit of the Client by deviating from the typical [contingency fee] arrangement. In accordance with this concession, all outstanding costs will be paid and all costs advanced by the Client and the Firm shall be refunded from any recovery before the Firm's attorneys' fees are computed and paid. The attorneys' fees payable to the Firm shall then be deducted from the net recovery prior to distribution of the remaining recovery to the Client."). By signing the retainer agreement, the client "acknowledged] that [Obenstine] will receive 66.67% and [the MAC defendants] will receive 33.33% of the Attorneys' Fees[.]" (Id. at ¶ 10).

On February 11, 2009, the MAC defendants, as counsel for the plaintiff class, filed the complaint in the Nevada litigation, representing purchasers of units in the East and West Towers. (See Dkt. 373, SAC at ¶¶ 18 & 20).

## II. SETTLEMENT OF THE NEVADA LITIGATION.

### A. Settlement of West Tower.

In September 2009,[3] Obenstine, Easterlin, and the MAC defendants considered an offer to settle claims with respect to the West Tower. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0127) (September 10, 2009, email from Billiter to Obenstine that she "spoke with Terry [Coffing] regarding a settlement offer of 66–70% + attorneys fees and costs"). Billiter also took part in the settlement discussions and communicated with class members regarding the settlement

terms. (See, e.g., Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0127 (September 15, 2009, email from Billiter to Obenstine that she "spoke with Terry [Coffing] regarding a settlement offer of 66–70% + attorneys fees and costs[,]" which was "[o]ne that I think I can make happen with the people in our group."); Dkt. 426–4, Class Cert. Evid. App'x, Exh. 24 at JA0474 (October 22, 2009, email from "Kay Jackson" to clients, stating that she is "working hard on getting the settlement done and want[s] to know the concerns of those in the group who do not want to take it")). After a settlement was reached, counsel for the parties began exchanging drafts of the settlement papers. A legal assistant from the MAC firm sent an email to Easterlin, Obenstine, and Coffing, attaching a draft of the joint motion for preliminary approval of the West Tower settlement. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0162) (October 13, 2009 email). In response, Obenstine asked the legal assistant who sent the email to "recall this message (if possible). [Easterlin] and I should be blind-copied whenever email messages are sent to opposing counsel." (Id.). Later that month, the parties settled the case with respect to the units in the West Tower. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 3 ("West Tower Settlement Agreement")).

NP1 paid $113,990,875 to settle the portion of the case relating to the West Tower. (See Dkt. 282, Plaintiffs' Response to Order to Show Cause at 6). The 1,050 West Tower class members who did not opt out of the settlement each received, on average, $108,563. (See id. at 4 & 6). In effect, the class members received a return of 74.4% of their escrow deposits. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 3 at JA0039, ¶ 6.1). From the settlement amount that each class member received, approximately 10.5%[4] or $14,069 was deducted for attorney's fees. (See id. at ¶¶ 10.1 & 11.3; id. at ¶ 11.3 ("Escrow Agent is further authorized

---

**3.** Also, on September 15, 2009, Obenstine, Easterlin, and Coffing received a letter from a rival Nevada law firm, which accused the MAC defendants of having "several agents who are engaged in direct solicitation of potential clients." (Dkt. 433–8, MSJ Evid. App'x, Exh. 28 at P0423).

**4.** Although the papers before the court in the Nevada litigation state that the plaintiffs' attorneys received 13.5% of the West Tower recovery, the parties appear to agree that they ultimately received 10.5%. (See, e.g., Dkt. 282, Plaintiffs' Response to Order to Show Cause at 3; Dkt. 433, MSJ Jt. Br. at 32).

and instructed to deduct [10.5%] from the Settlement Disbursements payable to Eligible Settlement Class Members[.]"); Dkt. 426–2, Class Cert. Evid. App'x, Exh. 10 at JA0167; Dkt. 282, Plaintiffs' Response to Order to Show Cause at 3)).

Four class representatives, including Sanjay "Sonny" Varma ("Varma"), received an incentive award of "$5,000 in addition to any other sums that they should otherwise be entitled to under the Settlement Agreement." (Dkt. 426–1, Class Cert. Evid. App'x, Exh. 4 at JA0059). Class members were advised to contact "Class Counsel" if they had any questions about the settlement; neither Obenstine nor the King & Spalding defendants were identified as class counsel. (See id. at JA0061) (identifying only the MAC defendants). Finally, the West Tower Settlement Agreement provided that "[a]ny disputes or controversies arising with respect to the interpretation, enforcement, or implementation of the Settlement Agreement shall be presented by motion to the Court" in the Nevada litigation.[5] (See id., Exh. 3 at JA0053, ¶ 24).

On December 14, 2009, the Nevada court granted final approval of the portion of the Nevada litigation relating to the West Tower. (See Dkt. 434–3, MSJ Evid. App'x at Exh. 3).

On December 16, 2009, Coffing sent an email to Obenstine and Easterlin advising them the attorney's fees from the West Tower settlement, excluding costs, totaled $14,419,510. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0161). Although the parties had contemplated dividing the fees in three equal parts, Coffing proposed that the "the fees be divided as follows[:] $5,600,000 to [the MAC defendants] (in addition to the admin) and $8,809,520 to Mark [Obenstine] and K & S."[6] (Id.).

With respect to Billiter, her compensation was contingent on the number of class members she retained that did not opt out of the settlement. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136) ("[Coffing] told me th[e]re are approximately 1063 opt ins which is where my compensation comes in.... We are still charging $1,000 until he talks to you and Ben [Easterlin] tomorrow. He may want to eliminate it altogether or reduce the fee.... If he is going to eliminate the up fro[n]t cost then we will have to adjust the early compensation to me."). Although Obenstine contends that Billiter was paid for administrative services, and not to retain clients, (see Dkt. 433–2, Joint Statement of Uncontroverted Facts Concerning Defendant Mark Obenstine's Motion for Summary Judgment/Adjudication of Issues ("SUF") at D54 & D55; Dkt. 434–10, MSJ Evid. App'x, Exh. 10 at 27–28 & 48–50), Billiter suggests that she provided administrative services for the clients she retained, provided some administrative services for clients retained by Obenstine, and no administrative services for clients retained by the MAC defendants. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0137) ("My only worry is that if we say Maverick[, an entity controlled by Billiter,] was paid per month then Maverick should have handled all of the documents and not just some and should have very accurate records on who paid and what they paid. I have the records for everyone I signed but not all of Marquis and Aurbach and a few of yours are missing."). Other than Obenstine's unsupported contention, the evidence indicates that Billiter received $200 for each client she retained from the West Tower, i.e., 325 deposit checks for a total of $65,000. (See id.).

---

**5.** The East Tower Settlement Agreement had an identical provision. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 5 at JA0086, ¶ 24).

**6.** It is unclear how the MAC defendants and Obenstine split the attorney's fees, but Obenstine contends that "[t]he amount of attorneys' fees paid to [him] pursuant to both the East Tower and West Tower was $12,081,707." (Dkt. 433, MSJ Jt. Br. at 32). The King & Spalding defendants ultimately did not receive any of the fees from the Nevada litigation. (See Dkt. 389–1, Dec-laration of Peter G. Nolan on Behalf of King & Spalding LLP at ECF 8317–18 ("King & Spalding has not, either directly or indirectly, received any fee or other consideration in any way related, either directly or indirectly, to the [Nevada l]itigation."); Dkt. 389–1, Declaration of Benjamin F. Easterlin, IV at ECF 8320–21 ("I have not, either directly or indirectly, received any fee or other consideration in any way related, either directly or indirectly, to the [Nevada l]itigation.").

Finally, although the class notice to the West Tower class members stated that class representative Varma[7] would receive no more than $5,000 for his services as a class representative, (see Dkt. 426–1, Class Cert. Evid. App'x, Exh. 4 at JA0059), Billiter stated in an email to Obenstine, "I spoke with Terry [Coffing] and there won't be any problem paying Sonny [Varma] with $43K. [Coffing] said he would just pay you extra since he is the actual attorney of record and it could flow through [Obenstine] with no problem." (Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0136).

## B. Settlement of the East Tower.

After concluding the settlement of the West Tower, Obenstine, Easterlin, and the MAC defendants worked together to settle the East Tower. (See Dkt. 433–8, MSJ Evid. App'x, Exh. 28 at P0415–18) (email thread from January 22, 2010, to February 4, 2010, among Coffing, Easterlin, and Obenstine regarding defendant's settlement offer of East Tower); (Dkt. 433–13, MSJ Evid. App'x, Exh. 49 at P0721) (Kay Jackson email to East Tower purchasers stating, "I know that many of you feel like you are being left out in the cold right now with all of the recent activity with the settlement with the West tower.... I met with Ben Easterlin and Mark Obenstine last week and had some questions regarding the Beach[8] tower."). In February 2010, the parties in the Nevada litigation entered into a settlement agreement regarding the units in the East Tower. (See Dkt. 426–1, Class Cert. Evid. App'x at Exh. 5 ("East Tower Settlement Agreement")).

NP1 paid $43,635,950 to settle the portion of the Nevada litigation relating to the East Tower. (See Dkt. 282, Plaintiffs' Response to Order to Show Cause at 6). The East Tower class members who did not opt out of the settlement each received, on average, $102,192. (See id. at 4 & 6). In effect, the class members received a return of 68.0% of their escrow deposits, less costs, fees, and a $350 escrow cancellation fee. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 5 at JA0071–72, ¶ 6.1). From the settlement amount that each class member received, approximately 7.82% or $8,899 was deducted for attorney's fees. (See id. at JA0075 & JA0077, ¶¶ 10.1 & 11.3; id. at JA0077, ¶ 11.3 ("Escrow Agent is further authorized and instructed to deduct [7.82%] of the principal amount of the Deposits paid under the respective Settlement Class Member's East Tower Purchase Contract")). Finally, class members were advised to contact "Class Counsel" if they had any questions about the settlement; again, neither Obenstine nor the King & Spalding defendants were identified as class counsel. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 6 at JA0094).

On April 6, 2010, the Nevada court granted final approval of the portion of the Nevada litigation relating to the East Tower. (See Dkt. 426–2, Class Cert. Evid. App'x at Exh. 9). This final approval resolved the entire Nevada litigation.

Obenstine and the MAC defendants agreed to "divide the East Tower Fees on a 50/50 basis exclusive of costs."[9] (Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0175). Billiter received approximately $18,000 to $19,200 for her services in recruiting approximately 90 to 96 East Tower purchasers. (See id. at P0143) ("The total amount paid to Maverick Services, Inc. (East Tower) for 2008 and 2009 is $19,200. That is a total number for accounting purposes only. Many opt-outs are included in this number that won't equate in the

---

7. In addition to Muszik, Billiter also withheld her identity from Varma. For example, in an April 21, 2010, email to Obenstine, Billiter stated:

> Just a reminder ... Please make sure you don't give the West [T]ower spread to Sonny [Varma] ever! He will catch that Kay is not on it. I have provided him with altered spread sheets and lists for the West Tower for the last year with my name and unit number and we don't want to get careless now.

(Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0144).

8. East Tower is also known as Beach Tower. (See Dkt. 426–1, Class Cert. Evid. App'x, Exh. 5 at JA0067).

9. Obenstine and the MAC defendants memorialized this agreement on January 5, 2010, shortly after concluding the settlement of the West Tower, but prior to commencing serious settlement negotiations regarding the East Tower. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0175).

total figure but I am assuming you need this number to account to M/A.") (April 7, 2010, email from Billiter to Obenstine); id. at P0137 ("In addition, there are 90 Beach tower contracts for a total of $18,000.").

## LEGAL STANDARD

■ The court has "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." Armstrong v. Davis, 275 F.3d 849, 871 n. 28 (9th Cir. 2001), cert. denied, 537 U.S. 812, 123 S.Ct. 72, 154 L.Ed.2d 14 (2002), abrogated on other grounds by Johnson v. Cal., 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). The court need only form a "reasonable judgment" on each certification requirement "[b]ecause the early resolution of the class certification question requires some degree of speculation[.]" Gable v. Land Rover N. Am., Inc., 2011 WL 3563097, *3 (C.D. Cal. 2011) (internal quotation marks omitted).

Rule 23[10] permits a plaintiff to sue as a representative of a class if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions or law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]" Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012).

In addition to fulfilling the four prongs of Rule 23(a), the proposed class must meet at least one of the three requirements listed in Rule 23(b). See Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541,

2548, 180 L.Ed.2d 374 (2011). Here, plaintiffs seek class certification under Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

■ Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the Rule[.]" Dukes, 564 U.S. at 350, 131 S.Ct. at 2551. A court must conduct a "rigorous" class certification analysis. Id. at 351, 131 S.Ct. at 2551 (internal quotation marks omitted). On occasion, this analysis "will entail some overlap with the merits of the plaintiff's underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the pleadings[.]" Id. at 350–51, 131 S.Ct. at 2551 (internal quotation marks omitted). However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied."); see Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n. 8 (9th Cir. 2011) (the district court may examine the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. To hold otherwise would turn class certification into a mini-trial.") (citations omitted).

## DISCUSSION[11]

### I. STANDING.

■ Before discussing the Rule 23 requirements, the court will address Oben-

---

10. Unless otherwise noted, all "Rule" references are to the Federal Rules of Civil Procedure.

11. Obenstine requests that the court strike plaintiffs' portion of the Joint Brief because they "initially submitted only non-final versions of their portion of the Joint Brief, Appendix, and exhibits" and then 11 days after the court's deadline, plaintiffs sent a revised brief, appendix and an additional exhibit, and thus failed to send their portion of the Joint Brief in a timely manner.

stine's argument that "Plaintiffs do not have federal standing for any claims they seek to pursue as class representatives." (See Dkt. 424–1, Class Cert. Jt. Br. at 39; see also id. at 3–4, 7, 13 & 38–39; Dkt. 429, Defendant[ ] Mark Obenstine's Supplemental Brief in Opposition to Plaintiffs' Motion for Class Certification ("Deft's Class Cert. Suppl. Br.") at 2); (Dkt. 424–1, Class Cert. Jt. Br. at 39) (Obenstine asserting that plaintiffs "failed to attempt (let alone demonstrate through 'proof') standing for any claims[, and] [f]or that reason alone, they failed to satisfy their Article III burden."). Although Obenstine's arguments are "better taken under the lens of typicality or adequacy of representation, rather than standing[,]" Forcellati v. Hyland's, Inc., 876 F.Supp.2d 1155, 1161–62 (C.D. Cal. 2012); see Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 530 (C.D. Cal. 2011) ("District courts in California routinely hold that the issue of whether a class representative may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation. Treatises and other circuits reach the same conclusion.") (internal quotation marks and citations omitted); Greenwood v. Compucredit Corp., 2010 WL 4807095, *3 (N.D. Cal. 2010) (discussing that "the appropriate question with respect to unnamed class members is not whether they have standing to sue but whether the named plaintiff may assert their rights" and concluding that "[a]lthough this question implicates the prudential function of the standing requirement, it finds legislative expression in the requirements of Rule 23 and is therefore a Rule 23 question, rather than one of standing") (internal quotation marks omitted), the court will address Obenstine's "standing" arguments here because

they raise both issues of standing and damages. Indeed, Obenstine's arguments improperly "conflate[ ] the issue of standing with the issue of remedies to which a party may be entitled."[12] Kwikset Corp. v. Sup. Ct., 51 Cal.4th 310, 336, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011) (internal quotation marks omitted).

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011) (internal quotation marks and alteration marks omitted); see Friends of the Earth, Inc., v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Spokeo, Inc. v. Robins, —— U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016), as revised (May 24, 2016). For an injury to be "concrete," it must be "real" and "not abstract." Id. (internal quotation marks omitted). In the class action context, "standing is satisfied if at least one named plaintiff meets the requirements." Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

Obenstine's assertions relating to plaintiffs' standing—some of which are nothing more than challenges to plaintiffs' entitlement to certain remedies—are unpersuasive.[13] First, Obenstine asserts that plaintiffs cannot show

(See Dkt. 424–1, Class Cert. Jt. Br. at 1 n. 1). Obenstine's request is denied because "the corrections [plaintiffs] made to the documents were minor and didn't impact the substance of the [Joint] Brief." (Id. at 2 n. 1) (describing clerical changes made to plaintiffs' portion of the joint brief).

12. "That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them." Kwikset Corp.

v. Sup. Ct., 51 Cal.4th 310, 336, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011) (internal quotation marks omitted).

13. The court hereby incorporates the portions of the Court's Order of January 29, 2017, that discussed and rejected Obenstine's arguments relating to plaintiffs' standing and remedies. (See Dkt. 498, Court's Order of January 29, 2017, at §§ I.B. & II.).

they suffered an "injury in fact" because they have no evidence they were damaged as a result of Obenstine's malpractice or breach of fiduciary duty. (See Dkt. 424–1, Class Cert. Jt. Br. at 24–25 & 40–41; Dkt. 429, Deft's Class Cert. Suppl. Br. at 2). Assuming plaintiffs can demonstrate damages, Obenstine further asserts that plaintiffs can "not satisfy the second prong of the Article III standing test: that the injury is fairly traceable to the challenged action of the defendant." (Dkt. 424–1, Class Cert. Jt. Br. at 40). According to Obenstine, "Plaintiffs must have actually relied on the misconduct to have been injured by the alleged conduct." (Id.). With respect to Naziri, Obenstine asserts that he, like most class members, "has not plead and cannot pled actual reliance with respect to any claim, as it is undisputed he was unaware there was even a settlement offer, unaware of any of Obenstine's alleged misrepresentations and did not take any action in connection with the settlement offer." (Id. at 41).

■ As an initial matter, with respect to whether plaintiffs have put forth evidence of damages and established an injury in fact, the court hereby incorporates the reasons set forth in the Court's Order of January 29, 2017. (See Dkt. 498, Court's Order of January 29, 2017, at §§ I.B., II.A. & II.B.). As for plaintiffs' supplemental UCL claim, it is premised on violations of plaintiffs' claims for malpractice and breach of fiduciary duty. (See Dkt. 373, SAC at ¶¶ 67–72; id. at ¶ 70). Further, Obenstine's assertions, (see, e.g., Dkt. 424–1, Class Cert. Jt. Br. at 40–41), that plaintiffs have not put forth evidence of reliance—whether it involves reliance on "Obenstine's alleged misconduct" or "Obenstine's alleged representation he was licensed to practice law in Nevada"—misconstrues plaintiffs' claims. As the California Supreme Court stated, in discussing the necessity to establish reliance in consumer misrepresentation cases, "We emphasize that our discussion of causation in this case is limited to such cases where, as here, a UCL action is based on a fraud theory involving false advertising and misrepresentations to consumers.... There are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application." In re Tobacco II Cases, 46

Cal.4th 298, 325 n. 17, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009); see, e.g., Glaski v. Bank of Am., Nat'l Ass'n, 218 Cal.App.4th 1079, 1101, 160 Cal.Rptr.3d 449 (2013) (plaintiff can allege UCL claim based upon wrongful foreclosure to real property); Los Angeles Mem'l Coliseum Comm'n v. Insomniac, Inc., 233 Cal.App.4th 803, 835, 182 Cal.Rptr.3d 888 (2015) (plaintiff can allege UCL claim based on failure to pay payroll taxes pursuant to 26 U.S.C. §§ 3101 & 3102). Plaintiffs' claims are predicated on Obenstine's conduct, not the conduct of the class members. Plaintiffs' liability theories and evidence support, at a minimum, several types of injury traceable to Obenstine's malpractice, breach of fiduciary, and unfair competition:

- Obenstine's employment of a runner or capper (e.g., Donna Billiter). (See Dkt. 424–1, Class Cert. Jt. Br. at 17–18 & 31); see also Cal. Bus. & Profs. Code § 6152 (making it unlawful for any person to solicit another person "to act as a runner or capper for any attorneys or to solicit any business for any attorneys"); Cal. Bus. & Profs. Code § 6154 ("Any contract for professional services secured by any attorney at law or law firm in this state through the services of a runner or capper is void."); id. (for any actions under § 17200, "any judgment shall include an order divesting the attorney or law firm of any fees and other compensation received pursuant to any such void contract"); Cal. R. Prof. Conduct 1–320 ("Neither a member nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer"); Cal. R. Prof. Conduct 2–200 ("Members shall not divide a fee for legal services with a lawyer who is not a partner/associate unless the client has consented in writing with full disclosure");

- Engaging in the unauthorized practice of law. (See Dkt. 424–1, Class Cert. Jt. Br. at 18–19); see also Cal. R. Prof. Conduct 1–300 ("A member shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction."); and

- Obenstine's failure to disclose to the Nevada court the attorney's fees he received from the Nevada litigation. (See Dkt. 424–1, Class Cert. Jt. Br. at 20–21); see also Cal. Bus. & Profs. Code § 6068(d) (duty of an attorney "never to seek to mislead the judge or any judicial officer by an artifice or false statement of law or fact").

Under the circumstances, defendant has not demonstrated, and the court is not persuaded, that reliance is a required element for any of plaintiffs' claims.

■ Second, with respect to the common law torts claims and the UCL claim, Obenstine again argues that disgorgement is not an available form of relief. (See Dkt. 424–1, Class Cert. Jt. Br. at 24–25 & 28). But as set forth in the Court's Order of January 29, 2017, plaintiffs may seek disgorgement of Obenstine's attorney's fees as a remedy to the common law torts of attorney malpractice and breach of fiduciary duty, or restitutionary disgorgement for the corresponding UCL claim. (See Dkt. 498, Court's Order of January 29, 2017, at §§ II.B. & II.C.).

Third, Obenstine asserts, as part of his portion of the Joint Brief dedicated to Article III standing, (see Dkt. 424–1, Class Cert. Jt. Br. at 38–43), that plaintiffs "lack standing to challenge the fee agreement between [the MAC defendants] and Obenstine … as it is undisputed Plaintiffs were not parties to that agreement." (Id. at 42). According to Obenstine, the MAC defendants are an indispensable party regarding any claim for breach of the private fee sharing agreement between Obenstine and the MAC defendants. (See id. at 42–43). The court addressed and rejected Obenstine's assertions relating to the fee agreement between Obenstine and the MAC defendants and whether the MAC defendants are an indispensable party. (See Dkt. 498, Court's Order of January 29, 2017, at § I.B.).

Finally, Obenstine contends that plaintiffs cannot assert a violation of the CLRA because they seek only injunctive relief, "which

is not possible here since there is nothing to enjoin[,]" as "Plaintiffs clearly do not intend to retain Obenstine [as their attorney] in the future."[14] (Dkt. 424–1, Class Cert. Jt. Br. at 28 & 29). Even assuming, as Obenstine contends, that there is nothing to enjoin, plaintiffs are authorized, under the CLRA, to seek "restitution, and '[a]ny other relief that the court deems proper.'" Gonzales v. CarMax Auto Superstores, LLC, 845 F.3d 916, 918 (9th Cir. 2017) (quoting Cal. Civ. Code § 1780(a)).

## II. RULE 23(a) REQUIREMENTS.

### A. Numerosity.

■ A putative class may be certified only if it "is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers[.]" See Jordan v. Cnty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members[.]" Slaven v. BP Am., Inc., 190 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473–74 (C.D. Cal. 2012).

■ This factor is not in dispute, (see Dkt. 424–1, Class Cert. Jt. Br. at 30), given that the putative class comprises 1,479 individuals who did not opt out of the Nevada litigation, and the putative subclass is made up of "hundreds" of individuals who entered into retainer agreements with Obenstine. (See id. at 29); (see Dkt. 373, SAC at ¶ 19) (alleging that there are "over 500 condominium unit purchasers signed retainer agreements").

---

14. With regard to this argument, the court denied Obenstine's motion for summary adjudication to the extent he argued that Estakhrian and Naziri lacked standing to assert a CLRA claim for non-monetary relief. (See Dkt. 498, Court's Order of January 29, 2017, at § II.C.2.). The court however did grant Obenstine's motion to the extent plaintiffs seek monetary damages for violation of the CLRA. (See id.).

### B. Commonality.

The commonality requirement is satisfied if "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). Commonality requires plaintiffs to demonstrate that their claims "depend upon a common contention ... [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (The commonality requirement demands that "class members' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.") (internal quotation marks omitted). "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." Mazza, 666 F.3d at 588 (internal quotation marks omitted). "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." Abdullah v. U.S. Sec. Assocs., Inc. 731 F.3d 952, 957 (9th Cir. 2013), cert. denied, —— U.S. ——, 135 S.Ct. 53, 190 L.Ed.2d 30 (2014) (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single significant question of law or fact[,]" and concluding that it remains a distinct inquiry from the predominance issues raised under Rule 23(b)(3)). Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Id.

Here, plaintiffs identify five common issues: (1) Whether Obenstine used and paid runners and cappers to induce investors to retain him and his co-venturers; (2) Whether Obenstine engaged in the unauthorized practice of law in his covert representation of the class members in the Nevada litigation; (3) Whether Obenstine violated Rule 2–200, which provides that "[m]embers shall not divide a fee for legal services with a lawyer who is not a partner/associate unless the client has consented in writing with full disclosure; the total fee is not increased solely by reason of the division and is not unconscionable;" (4) "Whether Obenstine covertly received fees in connection with the [Nevada litigation], and whether those fees should, therefore, be disgorged; and (5) Whether Obenstine unlawfully withheld $250 (or more) of his clients' retainers as 'administrative fees.'" (Dkt. 424–1, Class Cert. Jt. Br. at 31).

Obenstine does not present any argument as to whether any of these questions are capable of classwide resolution, (see, generally Dkt. 424–1, Class Cert. Jt. Br. at 31–34); instead, he impermissibly "engage[s] in free-ranging merits inquiries at the certification stage." Amgen, 133 S.Ct. at 1194–95; see Ellis, 657 F.3d at 983 n. 8 (noting that such an "in-depth examination of the underlying merits" would "turn class certification into a mini-trial"). Indeed, throughout his portion of the Joint Brief, Obenstine's attorney, instead of discussing why plaintiffs have not satisfied any particular Rule 23 factor, constantly raises factual challenges that are unnecessary to demonstrate commonality.[15] See Stockwell v. City & Cnty. of S.F., 749 F.3d 1107, 1113 (9th Cir. 2014) ("[P]roof of a factor that would ultimately be essential to success on the class's claims [is] not merely unnecessary to demonstrate commonality, but [is] also unnecessary to demonstrate that such commonality predominates.") (emphasis omitted). For example, with respect to plaintiffs' first common question,

---

**15.** Many of Obenstine's contentions simply relate to damages calculations. (See, e.g., Dkt. 424–1, Class Cert. Jt. Br. at 33) ("Individualized discovery is ... required to determine (1) what amount was charged to each client, (2) what was refunded, and (3) in which cases was the non-refund permissible to recoup costs advanced?"). However, in the Ninth Circuit, "damage calculations alone cannot defeat certification." Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010).

Obenstine contends that "only 1 out of 1,479 people (Estakhrian) 'believes' he was contacted by a capper[.]" (See Dkt. 424–1, Class Cert. Jt. Br. at 32). The issue, however, is not whether any class member communicated with Billiter, although we know that many did because, as Obenstine noted, Billiter was the one that was "better at closing the deal with the exceedingly hesitant prospective clients." (Dkt. 433–5, MSJ. Evid. App'x, Exh. 19 at P0126 (April 8, 2009, email, in which Obenstine requested that Billiter "please call [a potential client]. He is still unsigned. You are better at closing the deal with the exceedingly hesitant prospective clients")). Rather, the issue and common question, which can be resolved on a classwide basis, is whether Billiter's conduct was sufficient to render her a runner or capper within the meaning of California Business & Professions Code § 6152.

Similarly, with respect to common issue number four, Obenstine asserts that

[i]t is undisputed that [the MAC defendants] and Obenstine retainer agreements both clearly state Obenstine would receive fees. Plaintiffs ignore this, and the fact that Naziri, like more than 1,000 other putative class members, did not retain Obenstine. Plaintiffs fail to explain how they could establish every class member that did not retain Obenstine was denied notice he would receive fees.

(Dkt. 424–1, Class Cert. Jt. Br. at 33) (emphasis in original).

Obenstine's arguments in this regard are difficult to reconcile. On the one hand, Obenstine argues that he was "not class counsel" and, therefore: (1) he had no obligation to apprise the Nevada court of his fee-sharing agreement with the MAC defendants; and (2) plaintiffs have no standing to disgorge his attorney's fees because all the fees belong to the MAC defendants and not to the class. (See Dkt. 424–1, Class Cert. Jt. Br. at 22). On the other hand, Obenstine concedes that he entered into a joint venture with the MAC defendants to pursue the Nevada litigation. (See Dkt. 426–4, Class Cert. Evid. App'x, Exh. 18, Declaration of Mark Obenstine in Support of Special Motion to Strike Plaintiff's First Amended Complaint ("Obenstine Decl.") at ¶ 2) ("In early 2009, I, along with Terry Coffing and his firm, Marquis & Aurbach, represented James Estakhrian and other purchasers of Cosmopolitan Resort Casino … condominiums in [the Nevada litigation]."). Obenstine also concedes that the retainer agreements "were necessarily and expressly superseded by the Nevada Court's Order." (Id. at 42). Yet, if Obenstine was not class counsel, i.e., he did not represent any class members, then how can his retainer agreements with subclass members be "expressly superseded by the Nevada Court's Order?" Putting aside the obvious inconsistencies in Obenstine's position regarding whether he represented the class in the Nevada litigation, Obenstine does not explain how a client who signed a retainer agreement to pursue a mass arbitration in California ended up being a class member in a class action in Nevada. (See Dkt. 424–1, Class Cert. Jt. Br. at 19 ("Obenstine concedes he was retained by a small portion of the 'class' to pursue a 'mass arbitration' [in California] as specified in his agreement."); id. at 32 ("Estakhrian does not dispute the valid retainer agreement permitted Obenstine to pursue claims in California where he was admitted.")). In any event, Obenstine's assertions raise several common questions relating to whether Obenstine was, in effect, class counsel in the Nevada litigation, whether he improperly received attorney's fees and, if he did, whether they should be disgorged.

■■■ "[S]ettlement class actions present unique due process concerns for absent class members," and a court "has a fiduciary duty to look after the interests of those absent class members." Allen v. Bedolla, 787 F.3d 1218, 1223 (9th Cir. 2015). In deciding whether to approve the settlement of a class action, a court must, among other things, consider: (1) whether plaintiffs' counsel have any conflicts with any of the class members, Ellis, 657 F.3d at 985; (2) whether plaintiffs' counsel will "prosecute the action vigorously on behalf of the class[,]" id.; and (3) "the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural Telecommc'ns v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004). In addition, class mem-

bers have an ownership interest in the attorney's fees in that they are awarded as part of the compensation to the class, not as a benefit for the attorneys. See Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1326 (9th Cir. 1999), cert. denied, 529 U.S. 1066, 120 S.Ct. 1671, 146 L.Ed.2d 481 (2000) (noting that class members pay attorney's fees out of a common fund such that they "lose money out of [their] own pocket[s] to the extent that it is paid to the class's lawyers"). Because a "court has a special duty to protect the interests of the class," it "must act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is[.]"[16] Rodriguez v. Disner, 688 F.3d 645, 655 (9th Cir. 2012) (citation and internal quotation marks omitted). Indeed, "[o]n this issue, the class's lawyers occupy a position adversarial to the interests of their clients." Howell v. JBI, Inc., 298 F.R.D. 649, 659 (D. Nev. 2014).

■■■ Although Obenstine insists that he was not class counsel, (see Dkt. 424–1, Class Cert. Jt. Br. at 22), he received 66 percent or $12 million, of the attorney's fees that were awarded to counsel for representing the two classes. (See Dkt. 424–1, Class Cert. Jt. Br. at 2 & 11). Despite receiving two-thirds of the attorney's fees that were awarded to class counsel in the Nevada litigation, the trial judge who approved the settlement was never made aware of Obenstine's participation in the case, was not able to assess the reasonableness of the hours claimed by counsel (especially the hours spent by Obenstine), could not assess the competency of Obenstine's representation, and could not examine whether there was any conflict between him (or any other attorney involved in the case, e.g., Easterlin) and the class members he was purportedly representing. Under the circumstances, there is a common question as to whether the trial judge's fiduciary duty to the class was undermined by Obenstine's and

the joint venturers' failure to disclose to the Nevada court the identities and amount of time put into the case by all the attorneys, including Obenstine. See Howell, 298 F.R.D. at 659 ("In setting the amount of common fund fees, the district court has a special duty to protect the interests of the class."); see also Allen, 787 F.3d at 1223 ("district court has a fiduciary duty to look after the interests of those absent class members"). As plaintiffs' expert, Ellen Pansky, Esq., stated in her report: "By obtaining secret and concealed fees in the [Nevada litigation] without disclosing to the court that the attorney fees were being shared with Mr. Obenstine and potentially with Mr. Easterlin and without obtaining court approval for the receipt of the majority of the court-approved attorney fees, Mr. Obenstine and Mr. Easterlin fell below the standard of care and breached their duties of candor to the court, and under applicable authorities." (Dkt. 426–4, Class Cert. Evid. App'x, Exh. 27 at ¶ 9, JA0514). In short, the common questions of whether Obenstine improperly received fees in connection with the Nevada litigation, and whether those fees should be disgorged may "generate common answers apt to drive the resolution of the litigation." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551 (internal quotation marks and emphasis omitted).

Although only one common question is necessary, the remaining questions may also be answered as to all class members. They are all, in one way or another, premised on Obenstine's behavior rather than on plaintiffs, i.e., whether Obenstine engaged in malpractice and/or other unethical or unfair conduct. The common questions listed above are all susceptible to common proof—that is, testimony by plaintiffs and their expert(s) as to whether Obenstine paid runners and cappers to induce individuals to retain him and his co-venturers, and whether Obenstine engaged

---

**16.** Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In diversity actions such as this one, the Ninth Circuit applies state law to determine the right to fees and the method for calculating fees. See Mangold v. Cal. Public Util. Comm'n, 67 F.3d 1470, 1478 (9th Cir. 1995) ("Existing Ninth Circuit precedent has applied state law in determining not only the right to fees, but also in the method of calculating the fees."); Rodriguez, 688 F.3d at 653 n. 6 (9th Cir. 2012) ("If . . . we were exercising our diversity jurisdiction, state law would control whether an attorney is entitled to fees and the method of calculating such fees.").

in the unauthorized practice of law in the Nevada litigation—the "truth or falsity" of which "will resolve an issue that is central to the [claims'] validity[.]" See Dukes, 564 U.S. at 350, 131 S.Ct. at 2551. Obenstine's conduct either violated the law as to all class members in the Nevada litigation or he did not violate the law as to anyone. In short, the questions raised by plaintiffs go to the contentions at the heart of plaintiffs' claims, i.e., the claims "depend upon a common contention ... [that is] of such a nature that it is capable of classwide resolution[.]" See id.

C. Typicality.

 Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. (internal quotation marks omitted). The typicality requirement is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1019 (9th Cir. 2011), abrogated on other grounds in Comcast Corp. v. Behrend, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (internal quotation marks omitted).

Obenstine does not address why the claims of the named plaintiffs are not typical of the claims of the proposed classes. (See, generally, Dkt. 424-1, Class Cert. Jt. Br. at 34–36). Instead, he again raises arguments regarding the merits of plaintiffs' claims. (See, e.g., id. at 35–36) ("Plaintiffs also surmise Obenstine should disgorge his fees because he used a 'capper.' ... Estakhrian is the only person who alleges he 'believes' he was solicited, and his allegation is easily refuted by the Jafary emails referring him to Obenstine."). Indeed,

Obenstine's arguments appear to undermine the foundation of the settlement of the Nevada litigation. Under Obenstine's approach, the Nevada litigation should not have been approved because "[t]he mere fact both Plaintiffs were investors in the same development as were some of the other putative class members is meaningless given the vast factual dissimilarities in their narratives." (Id. at 35). Yet, that is the class that was approved for settlement purposes in the Nevada litigation. (See Dkt. 426-2, Evid. Appx. at Exh. 9; id. at Exh. 10). Each settlement class in the Nevada litigation was defined as "All individuals, entities, or trusts who executed purchase contracts to purchase one or more of the units in the [East or West] Tower of the Cosmopolitan Resort & Casino in Las Vegas, who have not had their deposit returned and have not otherwise released claims against defendants." (Dkt. 426-2, Class Cert. Evid. App'x, Exh. 9 at ¶ 2; id., Exh. 10 at ¶ 2).

 In any event, the court is persuaded that plaintiffs' claims are "reasonably co-extensive with those of absent class members[.]" Hanlon, 150 F.3d at 1020. Their claims arise from the same course of alleged misconduct engaged in by Obenstine as part of the Nevada litigation. In other words, the named plaintiffs "have the same or similar injury" that was caused by "the same course of conduct" as other members of the two classes. See Ellis, 657 F.3d at 984 (internal quotation marks omitted). Although the injury might vary somewhat, the harm class members suffered as a result of Obenstine's conduct is sufficiently comparable so as to satisfy typicality.

D. Adequacy of Representation.

 Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit uses a two-prong test to determine whether the representative parties meet this standard: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of

the class?" Ellis, 657 F.3d at 985 (internal quotation marks omitted). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." Id. The adequacy of counsel is also considered under Rule 23(g).

Obenstine does not directly not address whether the class representatives and their counsel have any conflicts of interest with other class members or whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the classes. (See, generally, Dkt. 424-1, Class Cert. Jt. Br. at 38–43). Instead, he raises arguments regarding standing and choice of law. Those arguments are addressed in other sections of this Order and the Court's Order of January 29, 2017. See infra at § III.A.; (Dkt. 498, Court's Order of January 29, 2017, at § I.B.).

In any event, the proposed class representatives do not appear to have any conflicts of interest with the absent class members. As Estakhrian states, "[a]t all times in this litigation, I have acted not only on my behalf but also on behalf of everyone else that participated in the settlement of the [Nevada] litigation." (Dkt. 389-1, Exh. 5 (Declaration of James Estakhrian [ ] ) at ¶ 5). "I am not aware of any conflict of interest that I might have with other class members." (Id. at ¶ 6). "We all invested in the same development (the Cosmopolitan resort); we were all purportedly represented by the Defendants in an effort to recover our purchase deposits; we all suffered the same injury at Defendants' hands; and we all did not get all of our money back as I think we should have." (Id.).

◼ Similarly, Naziri states that his "sole motivation [for being a class representative] is to help achieve a measure of justice for the Cosmopolitan investors and hold those responsible accountable for those losses." (Dkt. 389-1, Exh. 6 (Declaration of Abdi Naziri [ ] ) at ¶ 8). Like the other class members, Naziri purchased a unit in the Cosmopolitan Hotel and Casino and received only a partial return of his deposit. (See id. at ¶¶ 3 & 4; Dkt. 373, SAC at ¶ 43). In short, "[t]he adequacy-of-representation requirement is met here be-

cause Plaintiffs have the same interests as the absent Class Members[.] Further, there is no apparent conflict of interest between the named Plaintiffs' claims and those of the other Class Members'—particularly because the named Plaintiffs have no separate and individual claims apart from the Class." Barbosa v. Cargill Meat Solutions Corp, 297 F.R.D. 431, 442 (E.D. Cal. 2013).

Finally, plaintiffs request that the court appoint as class counsel lawyers from the firms Chavez and Gertler, Fay Law Group, Irvine Law Group, and Mehri & Skalet. (See Dkt. 424, Motion at 1; see also Dkt. 424-1, Class Cert. Jt. Br. at 36). The attorneys from these firms—Mark Chavez, Raymond C. Fay, S. Ron Alikani, and Steven Skalet— have many years of experience in class action litigation. (See Dkt. 389-1, Declaration of Mark Chavez [ ] at ¶¶ 3–15; id. at Exh. 7 (Declaration of Steven A. Skalet [ ] at ¶¶ 3– 8); id. at Exh. 8 (Declaration of Raymond C. Fay [ ] at ¶¶ 2–7) & id. at Exh. 9 (Declaration of S. Ron Alikani [ ] at ¶¶ 3–5). Obenstine did not raise any arguments, (see, generally, Dkt. 424-1, Class Cert. Jt. Br. at 38–43), as to whether plaintiffs' counsel have "any conflicts of interest with other class members" or whether they will "prosecute the action vigorously on behalf of the class[.]" See Hanlon, 150 F.3d at 1020. Nevertheless, based on plaintiffs' counsel's representations, and having observed counsel's diligence in litigating this case, the court finds that plaintiffs' counsel are competent, and that the adequacy of representation requirement is satisfied. See Barbosa, 297 F.R.D. at 443 ("There is no challenge to the competency of the Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases."); Avilez v. Pinkerton Gov't Servs., Inc., 286 F.R.D. 450, 457 (C.D. Cal. 2012) vacated and remanded on other grounds, 596 Fed.Appx. 579 (9th Cir. 2015) ("Defendants do not dispute and the evidence confirms that, as detailed in their declarations, Plaintiff's counsel are experienced class action litigators who have litigated many … class actions and have been certified as class counsel in numerous other class actions[.]").

## III. RULE 23(b)(3) REQUIREMENTS.

■ Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted). Rule 23(b)(3) requires two different inquiries, specifically a determination as to whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A. Predominance.

■ "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997). "Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance test], the 23(b)(3) test is far more demanding[.]" Wolin, 617 F.3d at 1172 (internal quotation marks omitted). "The predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case and tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) (internal quotation marks omitted); see In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (The "focus is on the relationship between the common and individual issues.") (internal quotation marks omitted). The class members' claims do not need to be identical. See Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir.), cert. denied, 534 U.S. 973, 122 S.Ct. 395, 151 L.Ed.2d 299 (2001) (allowing "some variation" between class members). The focus is on whether the "variation [in the class member's claims] is enough to defeat predominance under Rule 23(b)(3)." Id.; see Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) ("[C]ourts have taken the common sense approach that the class is united by a common interest in determining whether defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions[.]").

Here, other than raising a choice of law argument, (see Dkt. 424-1, Class Cert. Jt. Br. at 45-47), Obenstine raises no other arguments to challenge plaintiffs' showing of predominance. (See, generally, id.). Obenstine contends that the proposed class cannot be certified because plaintiffs seek certification of a "nationwide" class of 1,479 members, (see id. at 46), and "the laws of the various states differ substantially concerning the same claims Plaintiffs seek recovery under." (Id. at 47). Obenstine's contentions are unpersuasive.

As an initial matter, Obenstine repeatedly refers to the proposed class and subclass as a "nationwide" class. (See Dkt. 424-1, Class Cert. Joint Br. at 3, 4, 6, 12, 13, 14, 16, 26, 28, 29, 32, 35, 38, 46, 49 & 50). However, he provides no evidence that any class member is from a state whose attorney malpractice, breach of fiduciary duty, or unfair competition laws (hereinafter, "subject law") differ from those of California. (See, generally, id.) The class and subclass plaintiffs seek to certify comprise a total 1,479 purchasers of condominium units in two buildings in Las Vegas, Nevada. (See Dkt. 424-1, Class Cert. Jt. Br. at 29). Other than Nevada and California where the class representatives and "approximately half of the proposed class members are citizens of[,]" (Dkt. 373, SAC at ¶ 11), there is no indication in the record as to whether there are class members from any other states. (See, generally, Dkt. 424-1, Class Cert. Jt. Br.). Further, Obenstine does not explain why the Nevada court had jurisdiction over all of the purported out-of-state class members and this court does not. (See, generally, id.; Dkt. 429, Deft's Class Cert. Suppl. Br.).

■ In any event, as this is a diversity case, (see Dkt. 373, SAC at ¶ 11), the court follows the choice of laws rules of California, the forum state. See Mazza, 666 F.3d at 589

("A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law.") (internal quotation marks omitted). "Under California's choice of law rules, the class action proponent bears the initial burden to show that California has significant contact or significant aggregation of contacts to the claims of each class member." Id. (internal quotation marks omitted). "Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate that foreign law, rather than California law, should apply to class claims." Id. at 590 (internal quotation marks omitted).

■■■ "California law may only be used on a classwide basis if the interests of other states are not found to outweigh California's interest in having its law applied." Mazza, 666 F.3d at 590 (internal quotation marks omitted). The California Supreme Court has set forth a three-step governmental interest test:

First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state[,] and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

McCann v. Foster Wheeler LLC, 48 Cal.4th 68, 81–82, 105 Cal.Rptr.3d 378, 225 P.3d 516 (2010) (internal quotation marks omitted).

■■■ Here, Obenstine is "an attorney admitted to practice in California[,]" (Dkt. 426–4, Class Cert. Evid. App'x, Exh. 18 at JA0347, ¶ 1), and during the course of the Nevada litigation, he represented putative class members from his office in Newport Beach, California. (See id., Exh. 24 at JA0464). As an attorney licensed in California, Obenstine's professional obligations are governed by the California Rules of Professional Conduct and Business and Professions Code. "Application of [the conflict of interest] test in legal malpractice cases has led to courts consistently applying the law of the jurisdiction in which the attorney is admitted to practice, has an office, and where the legal services were performed." Am. Exp. Partners, LLC v. Inman, 2005 WL 6172582, *6 n. 7 (C.D. Cal. 2005); see Rosenthal v. Fonda, 862 F.2d 1398, 1402–03 (9th Cir. 1988) (New York law applies where attorney was "licensed to practice law only in New York, at the time he entered into the contract"). Finally, "approximately half of the proposed class members are citizens of California[.]" (Dkt. 373, SAC at ¶ 11). In short, plaintiffs have met their burden of showing "that California has significant contact or significant aggregation of contacts to the claims of each class member." Mazza, 666 F.3d at 589 (internal quotation marks omitted). Therefore, "the burden shifts to [Obenstine] to demonstrate that foreign law, rather than California law, should apply to [the] class claims." Id. at 590 (internal quotation marks omitted); see Frenzel v. AliphCom, 76 F.Supp.3d 999, 1008 (N.D. Cal. 2014) ("The burden is on the party opposing the presumption that California law applies to show that foreign law should govern the case.").

■■■ Here, Obenstine has failed to meet his burden of showing that foreign law, rather than California law, should apply to the class claims. As noted earlier, Obenstine, who personally represented approximately 500 class members, has not put forth any class member from another state who could or desires to assert a claim based on the subject law from the class member's state. (See, generally, Dkt. 424–1, Class Cert. Jt. Br.; Dkt. 429, Deft's Class Cert. Suppl. Br.). Other than California, Nevada appears to be the only state that might have an interest in this case. However, there appears to be no conflict between California and Nevada law with respect to the subject law from each state. For example, in Nevada, "the tort of unfair competition is extremely flexible, and

courts are given wide discretion to determine whether conduct is 'unfair[.]' "[17] Golden Nugget, Inc. v. Am. Stock Exch., Inc., 828 F.2d 586, 591 (9th Cir. 1987); see Menalco v. Buchan, 2010 WL 428911, *26 (D. Nev. 2010) (Nevada unfair competition law is "grounded in deception or appropriation of the plaintiff's property") (internal quotation and alteration marks omitted); Custom Teleconnect, Inc. v. Int'l Tele–Servs., Inc., 254 F.Supp.2d 1173, 1182 (D. Nev. 2003) (holding that the Nevada "tort of unfair competition is extremely flexible and has been defined very broadly"). Also, Nevada recognizes both statutory and common law claims for unfair competition. See, e.g. Santoro v. Aargon Agency, Inc., 252 F.R.D. 675, 679 (D. Nev. 2008), as corrected (Oct. 21, 2008) (certifying class alleging Nevada statutory and common law unfair business practices claims); Nevada Deceptive Trade Practices Act, NRS §§ 598.0903, et seq.

Even assuming Obenstine had established that there was a "true conflict" between Nevada and California law with respect to the issues in this case, the nature and strength of California's interests would be significantly impaired if its laws were not applied in this case. California clearly has a strong interest in regulating the conduct of its attorneys to protect its citizens against unethical and improper conduct. See Canatella v. California, 404 F.3d 1106, 1110 (9th Cir. 2005) ("States traditionally have exercised extensive control over the professional conduct of attorneys, as each state has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses.") (internal quotation marks omitted). The core of plaintiffs' claims against Obenstine—the sole remaining defendant in this action—concerns Obenstine's failure to comply with his ethical and professional obligations under

California law. Although Nevada also has an interest in enforcing its attorney ethical rules, see Nevada R. Prof. Conduct 5.5(d)(2) ("A lawyer who is not admitted to practice in this jurisdiction shall not: ... Represent or hold out to the public that the lawyer is admitted to practice law in this jurisdiction."), the laws of California and Nevada are consistent in this regard. See Cal. R. Prof. Conduct 1–300 ("A member shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction."). Moreover, because Obenstine is not licensed to practice in Nevada and he did seek or obtain pro hac vice admission in the Nevada litigation, it is unlikely that Nevada would be able take any action against Obenstine because he is not a member of the Nevada Bar.[18] Also, there is no doubt that California law should apply to the more than 500 subclass members who signed retainer agreements with Obenstine to pursue a mass arbitration in California. (See Class Cert. Jt. Br. at 19 ("Obenstine concedes he was retained by a small portion of the 'class' to pursue a 'mass arbitration' [in California] as specified in his agreement."); id. at 32–33 ("Estakhrian does not dispute the valid retainer agreement permitted Obenstine to pursue claims in California where he was admitted.")). Nor is there any doubt that California law should apply to plaintiffs' claims relating to Billiter, who sent out the retainer agreements at Obenstine's direction and actively recruited investors, including Estakhrian, in California.

Finally, even assuming there are class members from states other than California and Nevada, that is not an impediment to applying California law to the class members' claims. Plaintiffs' UCL claim is predicated on violations of Obenstine's alleged malpractice and breach of fiduciary duty. (See, e.g., Dkt.

---

17. Obenstine's reliance on Scovil v. Medtronic, Inc., 2015 WL 880614 (D. Nev. 2015), to argue that "Nevada has no unfair competition law[,]" (Dkt. 424–1, Class Cert. Jt. Br. at 15), is unpersuasive. In Scovil, the defendant argued that Nevada had no unfair competition law. See 2015 WL 880614, at *10. The court granted defendant's motion to dismiss solely because plaintiff had "not responded to this portion of [defendant's] motion and he therefore consent[ed] to dismissal of this claim." Id.

18. Despite Obenstine's repeated assertions that the Nevada court should resolve the issues in this case, (see, e.g., Dkt. 424–1, Class Cert. Jt. Br. at 6, 14, 16, 26 & 28), Obenstine does not explain how that court could do so as the Nevada court has no jurisdiction over him since Obenstine never made an appearance in that case.

424–1, Class Cert. Jt. Br. at 17–19) (Obenstine violated the UCL pursuant to California Rule of Professional Conduct 1–300 for the unauthorized practice of law and California Bus. & Profs. Code § 6152 for unlawful attorney solicitation). Obenstine, as a member of the California Bar, can only be sued in California on the basis of the subject claims. Further, Obenstine's reliance on Mazza to argue that plaintiffs' UCL claim may not be certified, (see Dkt. 424–1, Class Cert. Jt. Br. at 45–47), is unpersuasive. Mazza concerned alleged misrepresentations when purchasing a product, whereas this case concerns Obenstine's conduct providing services as an attorney. Cf. Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1131 (9th Cir. 2017) ("Class representatives must establish standing by, for example, showing that they bought the product or used the service at issue."). In Mazza, the class members purchased or leased their cars in different states "with materially different consumer protection laws[,]" 666 F.3d at 590, and thus the "place of the wrong" was where the sale and misrepresentations were made. Id. at 593–94. Here, other than Nevada, Obenstine's unfair business practices occurred in California. (See Dkt. 426–4, Class Cert. Evid. App'x, Exh. 18 at JA0347, ¶ 1 (Obenstine is "an attorney admitted to practice in California."); id., Exh. 24 at JA0464 (during the course of the Nevada litigation, Obenstine represented putative class members from his office in Newport Beach, California); see, e.g., Jonczyk v. First Nat. Capital Corp., 2014 WL 1689281, *4 (C.D. Cal. 2014) ("California [ ] has [a]n interest in applying the UCL to the activities of California businesses, regardless of whether injuries resulting from those activities are experienced by a California resident."); Forcellati v. Hyland's, Inc., 2014 WL 1410264, *3 (C.D. Cal. 2014) (defendants failed to demonstrate impairment of other state laws when "Defendants are headquartered [in] and presumably disseminated a good portion of the allegedly false advertising" from California).

### 1. Damages and Predominance.

As noted earlier, choice of law was the only argument defendant raised in his portion of the Joint Brief relating to predominance. (See Dkt. 424–1, Class Cert. Jt. Br. at 45–47). However, throughout his portion of the Joint Brief, Obenstine's attorney uses the "spaghetti approach" of "heav[ing] the entire contents of a pot against the wall in hopes that something w[ill] stick." Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003). Obenstine's "spaghetti approach" is exacerbated in this instance because there is so much overlap and confusion in his summary judgment and class certification papers, which are difficult to follow and comprehend. His arguments are often nonresponsive to the issue at hand, repetitive, and unsupported by any citation to the record or the case law. Still, the court has tried to extract and address all of Obenstine's relevant arguments.

Obenstine, often conflating standing and remedies, raises several arguments relating to the damages plaintiffs seek. (See Dkt. 424–1, Class Cert. Jt. Br. at 3–4, 7, 13, 28 & 38–43). The court has addressed these arguments both in this Order and in its order regarding Obenstine's summary judgment motion. See supra at § I.; (Dkt. 498, Court's Order of January 29, 2017, at §§ I.B. & II.). Although Obenstine repeatedly asserts that the damages plaintiffs seek requires individualized inquiry, (see e.g., Dkt. 424–1, Class Cert. Jt. Br. at 3–4 & 11–13), he never directly discusses plaintiffs' damages in the context of Rule 23(b)'s predominance requirement. (See, generally, id. at 45–47).

In Comcast Corp. v. Behrend, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), the Supreme Court held that the trial court should have assessed whether plaintiff's damages model was consistent with plaintiff's theory of liability even though that "requires inquiry into the merits of the claim." Id. at 1433. Although plaintiff must present the likely method for determining class damages, "it is not necessary to show that [this] method will work with certainty at this time." Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010). Further, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Industries, Inc., 716 F.3d 510, 514 (9th Cir. 2013). The same principles apply to awards of restitution. See Chavez, 268 F.R.D.

at 379 (discussing "damages" for all causes of action generally, which included Cal. Bus. & Prof. Code §§ 17200 and 17500); Zeisel v. Diamond Foods, Inc., 2011 WL 2221113, *11 (N.D. Cal. 2011) (applying Chavez to claims for restitution).

■■■ Here, plaintiffs' damages model appears to be tied to the underlying Nevada litigation. In other words, plaintiffs seek to disgorge the amount Obenstine received in attorney's fees [19] and distribute that amount to the class members whose recovery was reduced by the payment of attorney's fees to Obenstine.[20] "Where the only question is how to distribute damages, the interests affected are not the defendant's but rather those of the silent class members." Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1307 (9th Cir. 1990).

■■■ With respect to the breach of contract claim, the subclass seeks the balance of the $1,000 retainer (approximately $250) that was improperly withheld from the settlement proceeds of the Nevada litigation. (See Dkt. 373, SAC at ¶¶ 61–66). Although plaintiffs did not provide a damages model for the subclass, the claims of the approximately 500 class members may be certified as the specificity and extent of the harm suffered by these class members is clear, and will not overwhelm the common questions on liability.[21] See Kleen Products LLC v. Int'l Paper Co., 831 F.3d 919, 929 (7th Cir. 2016) ("We must see if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact."). Moreover, in applying Comcast, the Ninth Circuit has noted that individualized damages inquiries will not defeat class certi-

fication. See Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 988 (9th Cir. 2015), cert. denied, —— U.S. ——, 136 S.Ct. 2410, 195 L.Ed.2d 780 (2016) ("differences in damage calculations do not defeat class certification after Comcast"). In short, the court is satisfied that plaintiffs have shown "that their damages stemmed from the defendant's actions that created the legal liability." Leyva, 716 F.3d at 514.

Finally, throughout his portion of the Joint Brief, Obenstine contends that there are differences between Estakhrian and Naziri that prohibit certification in this case. (See Dkt. 424–1, Class Cert. Jt. Br. at 4–5). Obenstine also makes several scattershot contentions regarding various factual issues that he argues prevents certification. (See, e.g., id. at 18 ("Even assuming Obenstine used a capper..., wouldn't Plaintiffs be required to obtain evidence for each and every one of the 1,479 class members to determine if they were 'solicited'?); id. at 35 ("Plaintiffs also claim Obenstine 'withheld key information' about [the King & Spalding defendants' 'conflict.' They offer no evidence to reflect this information was 'withheld' from 1,477 putative individuals not before the Court.") (footnote omitted)); see also id. at 13, 18, 19–20, 22, 25).

Many of Obenstine's contentions are either factual disputes that go to the merits of the case, which the court will not resolve at this time, or they are irrelevant to any claim or certification issue. (See, e.g., Dkt. 424–1, Class Cert. Jt. Br. at 4–5) (statements that: (1) Estakhrian wanted to cancel escrow, while Naziri wanted to close escrow; (2) Estakhrian knowingly did not opt out of the settlement, while Naziri did not recall not

19. As noted previously, (see Dkt. 498, Court's Order of January 29, 2017, at §§ II.B. & II.C.1.), disgorgement of attorney's fees is a proper remedy as to Obenstine's alleged attorney malpractice and breach of fiduciary duty, and restitutionary disgorgement is a proper remedy for the corresponding UCL claim.

20. Arguably, plaintiffs could distribute the funds in accordance with the methodology utilized in the Nevada litigation, (see Dkt. 426–2, Class Cert. Evid. App'x, Exh. 9 at ¶ 38); (see id., Exh. 10 at ¶ 37), or with the approach taken in the settlement with the King & Spalding defendants. (See

Dkt. 418, Court's Order of February 16, 2016, at 16) (noting that plaintiffs calculated that "[t]he average settlement payment will be $2,056.01").

21. For example, amounts for the breach of contract claim can be computed by referring to the available information regarding which subclass members received some, none, or all of the $1,000 retainer they paid to Obenstine pursuant to the retainer agreement. (See Dkt. 433–5, MSJ Evid. App'x, Exh. 19 at P0172) (email between the MAC defendants and Obenstine regarding unaccounted for retainer funds).

opting out); see O'Donovan v. CashCall, Inc., 278 F.R.D. 479, 488 (N.D. Ill. 2011) ("[T]he court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis.") (internal quotation marks omitted). Others simply highlight why Estakhrian, not Naziri, represents the subclass of individuals who entered into a retainer agreement with Obenstine. (See, e.g., id.) (statements that Estakhrian retained Obenstine while Naziri did not). Contrary to Obenstine's contentions, all of plaintiffs' claims hinge on Obenstine's conduct, including, among other things, his supervision of Billiter's unlawful solicitation of clients and his covert representation of class members in the Nevada litigation. Given that plaintiffs' claims are based almost entirely on Obenstine's alleged misconduct, it is not necessary to determine, for example: (1) whether and which class member was recruited by Billiter; or (2) whether each class member was told that Obenstine would receive the majority of attorney's fees awarded, even though he did not make an appearance in the case. Obenstine either practiced law in Nevada without a license or he did not; he either disclosed the fee split to the Nevada court or he did not; or he either employed Billiter and split fees with her or he did not. Under the circumstances, Obenstine's alleged violations of California's professional and ethical rules of conduct will not only establish legal malpractice and breach of fiduciary duty but also liability under the UCL. See People ex rel. Herrera v. Stender, 212 Cal.App.4th 614, 632, 152 Cal.Rptr.3d 16 (2013) (violation of rule of professional conduct can form the basis of liability for breach of fiduciary duty and violation of the UCL).

In short, the court is persuaded that "[a] common nucleus of facts and potential legal remedies dominates this litigation." Hanlon, 150 F.3d at 1022. As discussed above, the common questions regarding Obenstine's conduct towards the class and subclass members of the Nevada litigation are central to this litigation. The answers to these questions, which would drive the resolution of the litigation, do not depend on the individual facts or circumstances of an individual class member's purchase of a unit in the Cosmopolitan or involvement in the Nevada litiga-

tion. Rather, the predominant questions are whether Obenstine: (1) committed malpractice or breached his fiduciary duty by retaining Billiter to improperly solicit clients and split fees with her; (2) committed malpractice or breached his fiduciary duty by failing to disclose to the Nevada court his attorney's fee split with the MAC defendants; (3) engaged in the unauthorized practice of law by representing the class in the Nevada litigation; and (4) breached the retainer agreement by failing to refund advanced costs before recovering his attorney's fees. See also supra at § II.B. Obenstine's conduct was either unethical or improper as to all class members or to none. Finally, class members' individual damages as to each of the subject claims are "capable of determination on a classwide basis, and those damages [are] traceable to ... plaintiff[s'] liability case." Munoz v. PHH Corp., 2013 WL 2146925, *24 (E.D. Cal. 2013) (internal quotation marks omitted).

## B. Superiority.

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." Wolin, 617 F.3d at 1175–76 (internal quotation marks omitted). To determine superiority, the court must look at

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Here, the majority of factors weigh in favor of certification.

 In cases in which plaintiffs seek to recover relatively small sums, and the disparity between litigation costs and the recovery sought renders plaintiffs unable to proceed individually, "[c]lass actions may permit the plaintiffs to pool claims which

would be uneconomical to litigate individually." Local Joint Executive Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163 (further finding that "[i]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover") (internal quotation marks and alteration omitted). Each class member's claim for the remaining portion of his or her escrow deposit and/or for the return of approximately $250 from the retainer agreement involve relatively small sums of money,[22] and the litigation costs would render individual prosecution of such claims prohibitive. See Amchem Prods., Inc., 521 U.S. at 617, 117 S.Ct. at 2246 (in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all") (internal quotation marks omitted); see, e.g., Chavez, 268 F.R.D. at 379 ("[T]he court determines that the class action is superior to maintaining individual claims for a small amount of damages[.]").

As to the second factor, Obenstine did not present any argument, (see, generally, Dkt. 424–1, Class Cert. Jt. Br. at 48–49), identifying any other litigation "already begun by ... class members." See Fed. R. Civ. P. 23(b)(3)(B). Thus, this factor is neutral. With respect to the third factor—the desirability of concentrating the claims in this forum—courts look at "the location of the parties, witnesses, and evidence[.]" Breeden v. Benchmark Lending Grp., Inc., 229 F.R.D. 623, 631 (N.D. Cal. 2005). Here, the class representatives are located in California. (See Dkt. 373, SAC at ¶¶ 4–5). While the class members are located in both California and Nevada, Obenstine—the sole remaining defendant in this action—is a member of the California Bar. Under the circumstances, the court finds that this factor weighs slightly in favor of certification.

The fourth factor relating to manageability is often described as the most important factor in the superiority analysis. See Daye v. Cmty. Fin. Serv. Centers, LLC, 313 F.R.D. 147, 173 (D.N.M. 2016) ("The fourth, final, and most important factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action[.]"). Here, plaintiffs seek recovery on behalf of two classes whose members reside in either California or Nevada. In his portion of the Joint Brief, Obenstine did not put forth any argument or evidence demonstrating that the classes plaintiffs seek to certify are obviously unmanageable. (See, generally, Dkt. 424–1, Class Cert. Jt. Br. at 48–50).

However, in his reply brief, Obenstine asserts that the proposed classes are not ascertainable because "a significant percentage of the proposed class necessarily were never exposed to any alleged misconduct which precludes certification." (Dkt. 429, Def't's Class Cert. Suppl. Br. at 6; see id. at 5–6 (citing In re ConAgra Foods, Inc., 302 F.R.D. 537, 568 (C.D. Cal. 2014) (assessing whether class is ascertainable)). Obenstine's assertion lacks merit for multiple reasons. First, Obenstine did not raise his ascertainability argument in the opening brief, (see, generally, Dkt. 424–1, Class Cert. Jt. Br.), and thus has waived it. See Forest Ambulatory Surgical Assocs., L.P. v. Ingenix, Inc., 2013 WL 11323601, *9 (C.D. Cal. 2013), on reconsideration in part sub nom. Forest Ambulatory Surgical Assocs., L.P. v. United Healthcare, 2014 WL 11395929 (C.D. Cal. 2014) (parties "waive any argument raised for the first time in their Reply"); Alaska Ctr. for Env't v. United States Forest Serv., 189 F.3d 851, 858 n. 4 (9th Cir.1999) (noting that an appellant who waives an argument by failing to raise it in his opening brief cannot raise the argument for the first time in his reply brief). Second, Obenstine's argument misconstrues this action as one premised on false or misleading misrepresentations, rather than an action for attorney malpractice and breach of fiduciary duty. (See Dkt. 373, SAC at ¶¶ 51–60). Finally, the Ninth Circuit recently rejected an ascertainability require-

---

22. With respect to the settlement with the King & Spalding defendants, plaintiffs calculate that "[t]he average settlement payment will be $2,056.01." (Dkt. 418, Court's Order of February 16, 2016, at 13).

ment, holding that "the language of Rule 23 does not impose a freestanding administrative feasability prerequisite to class certification." Briseno, 844 F.3d at 1125. The Briseno Court rejected an administrative requirement in part because Rule 23(b)(3) "already contains a specific, enumerated mechanism[,]" i.e., Fed. R. Civ. P. 23(b)(3)(D), to address any issues relating to management of a class action. Id. at 1127–28. The Ninth Circuit agreed with the Seventh Circuit's observation that "requiring class proponents to satisfy an administrative feasability prerequisite 'conflicts with the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns.' "[23] Id. (quoting Mullins v. Direct Digital, LLC, 795 F.3d 654, 663 (7th Cir. 2015)).

Finally, Obenstine contends that "there are three mechanisms for resolution far superior to a nationwide class action in California, which has a tenuous connection to the dispute: (1) resolution before the Court that approved the settlement and reserved the jurisdiction, (2) separate class action lawsuits in the various states where Defendants' clients are domiciled, or (3) separate actions by individual members who actually suffered harm as a result of the wrongful conduct alleged." (Dkt. 424–1, Class Cert. Jt. Br. at 50) (emphasis omitted). Obenstine's contentions are unpersuasive.

As the court previously concluded, the scope of the Nevada state court's jurisdiction is limited to the "administration," "consummation," "enforcement," "interpretation," "construction," and "implementation" of the East and West Tower settlement agreements. (See Dkt. 498, Court's Order of January 29, 2017, at § I.A.). Here, plaintiffs do not allege a breach of the East or West Tower settlement agreements. But even assuming they did, or that the issues in this case concern the terms of the settlement agreements in the Nevada litigation, Obenstine never appeared pro hac vice in the Nevada litigation and is not a member of the Nevada Bar, so there appears to be no basis for the Nevada court to exercise jurisdiction over him.

As for separate class actions in the various states where class members are domiciled, the court has already determined that the choice of law doctrine favors the application of California law in this action. See supra at § III.A. Further, as noted earlier, Obenstine has not shown that any class member, let alone any of the subclass members that signed retainer agreements with Obenstine, are from a state other than California or Nevada. (See, generally, Dkt. 424–1, Class Cert. Jt. Br. at 48–50). But even if there are class members from other states, Obenstine's proposal is plainly unmanageable, as it would require individual class members to litigate Obenstine's liability separately even though it could be established by common evidence. See supra at §§ II.B. & III.A. Also, Obenstine does not explain how class members from states other than California would establish personal jurisdiction over him. (See, e.g., Dkt. 424–1, Class Cert. Jt. Br. at 48–50).

Finally, the court is unclear as to the meaning and effect of Obenstine's third proposal, i.e., "separate actions by individual members who actually suffered harm as a result of the wrongful conduct alleged." (Dkt. 424–1, Class Cert. Jt. Br. at 50) (emphasis in original). Obenstine does not explain how to or who makes the determination that an "individual member" has "actually suffered harm as a result of the wrongful conduct alleged." (See, generally, id. at 49–50). In any event, if plaintiffs prove liability, damages may be calculated by class and subclass. Moreover, "in this circuit, . . . damage calculations alone cannot defeat certification." Yokoyama, 594 F.3d at 1094.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

---

23. In any event, even assuming ascertainability is a requirement for class certification, the fact remains that not only are the 1,479 putative class members ascertainable, they have already been ascertained—by name and address. (See Dkt. 465, Declaration of Eric J. Miller Regarding (A) Mailing of Notice; (b) Publication of Summary Notice; and (C) Report on Opt-Outs Received to Date [Regarding Settlement with King & Spalding Defendants] at ¶¶ 2–6) (describing claims administrator's efforts identifying and mailing notice regarding settlement with the King & Spalding defendants).

1. Plaintiffs' Motion for Class Certification (**Document No. 424**) is **granted**.

2. The court certifies the following class with respect to plaintiffs' claims for professional malpractice, breach of fiduciary duty, the UCL and the CLRA:

All individuals who were class members in, i.e. did not opt out of, <u>Daniel Watt, et al. v. Nevada Property 1, LLC, et al.</u>, Nevada District Court, Case No. A582541, excluding Sanjay Varma.

3. The court certifies the following subclass with respect to Estakhrian's breach of contract claim:

[All] class members who entered into a retainer agreement with Defendant Mark Obenstine regarding the subject matter of <u>Daniel Watt, et al. v. Nevada Property 1, LLC, et al.</u>, Nevada District Court, Case No. A582541.

4. The court hereby appoints plaintiffs as the class representatives for the class set forth in paragraph two above. Plaintiff Estakhrian is appointed as the class representative for the subclass set forth in paragraph three above.

5. The court hereby appoints Chavez & Gertler, the Irvine Law Group, Mehri & Skalet, and the Fay Law Group as class counsel.